UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

DWANE E. ENGLAND and
REBECCA ENGLAND, his wife,

Plaintiffs,

v.                                    Civil Action No. 2:17-CV-01369

J.B. HUNT TRANSPORT, INC.,
a wholly owned subsidiary of
J.B. HUNT TRANSPORT SERVICES, INC.,

Defendant.

MEMORANDUM OPINION AND ORDER

This is a suit for civil recovery under a "deliberate intent" exception to immunity from civil liability under West Virginia Code § 23-4-2(d)(2).

Pending before the court are the parties' cross-motions for summary judgment: the plaintiffs filed theirs on November 12, 2017, and the defendant followed on November 14, 2017. For the reasons set forth below, both motions are denied.

Fundamental to the resolution of this case is the following federal regulation which is partially quoted:

> No driver shall operate a commercial motor vehicle,
> and a motor carrier shall not require or permit a
> driver to operate a commercial motor vehicle, while
> the driver's ability or alertness is so impaired,
> or so likely to become impaired, through fatigue,
> illness, or any other cause, as to make it unsafe
> for him/her to begin or continue to operate the
> commercial motor vehicle.

49 C.F.R. § 392.3.

## I.    Facts

Dwane E. England (hereinafter England), who resides in Goldtown, Jackson County, West Virginia (not far from Ripley), was employed as an over-the-road tractor-trailer driver for J.B. Hunt Transport, Inc. (hereinafter JB Hunt), a Georgia corporation and a wholly owned subsidiary of J.B. Hunt Transport Services Inc., an Arkansas corporation which is a holding company.  JB Hunt has a transportation agreement with PPG Industries Inc. (hereinafter PPG) (Pffs. Ex. 1).  Indeed, the JB Hunt dispatch operated out of the PPG building in Pittsburgh. England was assigned to the PPG account as one of about eighty dedicated drivers.  Dep. of Nathan A. Anglin at p. 39-40.  When he was not on the road, England kept his tractor-trailer parked in a secure location at a truck stop off the Ripley/Fairplain exit on I-77, about ten miles from his Goldtown residence.

Just before 9:50 p.m. (CST)[1] on Sunday, February 15, 2015, while on his way home, England, who was ill, apparently

---

[1] Unless otherwise stated, this opinion uses Central Standard Time, following the practice in the JB Hunt records such as message logs.

lost control of the vehicle near mile marker 137 on I-77, about five miles away from the Ripley/Fairplain exit. Pffs. Ex. 27, Major Collision Review ("MCR"), at 3; West Virginia Uniform Traffic Crash Report at 1; Pffs. Br. at 11. England took his foot off the gas pedal, and, as the truck turned onto the highway shoulder, its speed steadily fell. MCR at 2-3. Then the truck hit a rock bed and overturned back onto the highway, causing England severe injuries, including the loss of his left arm above the elbow, punctured lungs, and several broken ribs. MCR at 2. In addition, England lost his memory of recent events that preceded the accident. Dep. of Dwane E. England at pp. 12, 103. His last memory before the accident dates back to several days prior. Id. at pp. 12-13. He does have a couple of memories of that which occurred soon after the crash, including one of talking to the state trooper who came to the scene, but not memories of events that constitute this factual narrative. Id. at p. 103.

England, who was born in 1955, is an experienced truck driver. Serving in the United States Air Force between 1975 and 1995, he received training on how to operate a tractor-trailer. England Dep. at pp. 20-22. Upon his return to civilian life, England worked at JB Hunt from 1995 to 2006 and again from 2011 until the accident. Between 2006 and 2011, he was employed as a truck driver by another company. MCR at 2. At the time of these events, England had driven 1.9 million safe miles with JB Hunt, and had not been involved in prior preventable collisions with the company. Id. When a driver reaches the 1 million safe

mile mark, JB Hunt recognizes his accomplishment with a bonus. Anglin Dep. at p. 164.  That may also be true of the 2 million mile mark.  Id.

In the early afternoon on Friday, February 13, England picked up a PPG load in Chester, South Carolina.[2]  The shipment was an export of glass fiber yarn destined to go to RM2 Canada, Inc. in Woodbridge, Ontario, to be delivered there on Monday, February 16.[3]  Pffs. Ex. 13, PPG Bill of Lading.

JB Hunt's dispatch log on Saturday, February 14 initially displayed England's destination as "HAVON" (which refers to Havelock, Ontario).  Pffs. Ex. 6, Dispatch Log; Dep. of Jamie Kleemook at p. 50.  As Jamie Kleemook, JB Hunt's General Manager for the PPG account, testifies, the "HAVON" location denotes the "T-call [termination point] of the current load."  Kleemook Dep. at p. 50.  The court notes that Woodbridge is a suburb of Toronto and that Havelock is about 105 miles to the northeast, between Toronto and Ottawa.

At the same time, Kleemook "vaguely recall[s]" that "the original order was scheduled to go to somewhere in Cleveland."  Id. at p. 51.  On Friday, John Appod, logistics

---

[2] The bill of lading indicates a time of 2:45 p.m. (perhaps EST), and the dispatch log indicates 11:51 a.m., which would be 12:51 p.m. EST.  Pffs. Ex. 13, PPG Bill of Lading; Pffs. Ex. 28, Detailed Dispatch/OBC Call Logs.

[3] JB Hunt is liable to PPG for, inter alia, "material delay" while it has the shipment or if it fails to perform its obligations.  Pffs. Ex. 1, ¶ 12.  The agreement stipulates that the liability will be for "full actual loss" but not more than $50,000 per shipment.  "Material delay" is defined in a somewhat complicated fashion but appears to indicate a delay in excess of 48 hours caused by circumstances within the carrier's "reasonable control."  Id.  At the same time, a PPG transportation planner, Jeffrey Brinker, testifies that if a JB Hunt driver is for some reason unable to complete a trip, "[w]e, as PPG, usually let J.B. Hunt figure . . . out" something like assigning a new driver to the load.  Dep. of Jeffrey Brinker at p. 9.

coordinator at JB Hunt (whose job duties constitute planning routes for various PPG loads), redirected it to Niles, Ohio (which the court notes is some 67 miles east of Cleveland; neither of those two points in Ohio is exceptionally far off the route to Woodbridge). Id.; Anglin Dep. at p. 32.

The parties differ on the original route England was supposed to follow, before Appod's action. On the one hand, plaintiffs contend that England was supposed to take the load all the way to Woodbridge. Pffs. Resp. at 3. In addition to the bill of lading, the dispatch entry at 11:51 a.m. on February 13 corroborates this account. Pffs. Ex. 28. On the other hand, JB Hunt maintains that England was only supposed to haul the Woodbridge-bound load as far as the JB Hunt yard in Niles, Ohio, and another driver would then transport it the rest of the way. Kleemook Dep. at 51 ("Appod [ ] needed the driver to drop the load at Niles, Ohio and then continue on to the Canadian shipment."); JB Hunt Br. at 3. The company claims that England was supposed to drive his empty trailer up to Havelock, Ontario, where he would pick up a new load and take it to Houston, Texas. Anglin Dep. at p. 283; JB Hunt Resp. at 3.

An evidentiary haze surrounding England's fateful trip persists beyond the initial itineraries. Evidence from the JB Hunt computer systems for Saturday, February 14, supports the drop-off location of the Chester load at the company's yard in Niles, Ohio. Dispatch Log. The dispatch message from the

Operation Supervisor[4] on duty, Grant Schoenfelder, at 4:07 p.m. on Saturday stated that England "requested to call," which caused Schoenfelder to show England in the system as being at the Niles "yard" in order to give England credit for "full miles," i.e., for pay-related purposes, even though he had not yet dropped off the shipment as of that time. Dispatch Log. Otherwise, the subsequent plan appears ambiguous. In fact, there is support for two apparently inconsistent alternatives following the drop-off – in one version England was supposed to drive to Canada, and in the other he would instead return to Ripley, West Virginia.

Schoenfelder also dispatched England on the next plan that England was to follow. Dispatch Log. An onboard computer ("OBC") message at 4:06 p.m. confirms the following plan, namely, the Havelock to Houston itinerary. Pffs. Ex. 7, OBC Message Log at 3. Yet, the accompanying 4:06 p.m. entry in the dispatch log read "NILOH ERIPWV" (for Niles, Ohio, and then empty to Ripley, West Virginia) and not "NILOH HAVON." Dispatch Log; Dep. of Grant S. Schoenfelder at pp. 54, 91. Schoenfelder acknowledges that the "NILOH ERIPWV" entry bears his initials, "GSC." Dispatch Log; Schoenfelder Dep. at p. 92. Nevertheless, Schoenfelder recalls routing England not to Ripley after Niles but to Havelock. Schoenfelder Dep. at p. 92. Schoenfelder attributes this decision to re-route England to a "message I received from Dwane earlier that day." Id. at p. 54. But the

---

[4] JB Hunt's title for dispatchers.

content of the message so received is not disclosed. Indeed, according to Schoenfelder, England and he exchanged "some messages back and forth" on Saturday, pertaining to England's request for the T-call, i.e., early termination of the route and reloading of the cargo. Schoenfelder Dep. at p. 46. The OBC log that is available as Pffs. Ex. 7, which starts on Saturday morning with a weather-related fleetwide message, does not contain any such messages.

England posted a message at 5:05 p.m. on Saturday, "where am i inbound to."[5] OBC Message Log at 5. At 5:42 p.m. Schoenfelder noted that he "T called" England but it is not clear what point the destination was changed to, inasmuch as the entirety of the message is not furnished to the court. Id. at 1. England then followed up at 5:50 p.m., "i didn't know that was this load for niles, thought it was the havelock on load. i have never seen a preload trl at havelock on." Id. at 6. England parked after a day's driving at a truck stop in Ringgold, West Virginia, near Morgantown. Id. at 8. At 5:58 p.m., he notified JB Hunt, in what is the first communication of his illness to JB Hunt in evidence, that he "was pretty sick" and so "stopped a little early" and planned to rest the following day and resume driving on Monday. Id. As with all OBC messages, this message carried a location stamp, which in this case indicated "Ringold" (sic) and "Morgantown." Id. There was no response to that message inasmuch as Schoenfelder

---

[5] Throughout, the original spelling and capitalization of OBC messages are preserved.

sent a sign-off message at 5:52 p.m.  Schoenfelder Dep. at p.
53; OBC Message Log at 1, 7.

Even if JB Hunt first received notice of his illness
at that time, England had been ailing before then.  He had sent
an SMS message to his wife at 6:43 p.m. (perhaps, EST) on
Thursday, which would have been the evening before he picked up
the load in Chester, South Carolina, indicating that he thought
he was coming down with something that "[f]eels like the flu."
Pffs. Ex. 14, England's SMS Message Log.  Around Saturday
evening, England again texted his wife, complaining of intense
pain, apparently from hemorrhoids, as well as a cold-like
condition.  JB Hunt Ex. A at 2.  "Still have fever and ache all
over.  Took Tylenol's," he wrote.  Id.  He also conveyed to her
the same determination to rest on Sunday and not to drive till
Monday that he had communicated to JB Hunt.  Id.

Early on Sunday morning, England sent two more text
messages on the company's OBC system, one at 6:16 a.m.
emphatically stating that he was "so sick i will not be able to
go anywhere today" and another at 7:02 a.m. requesting a
"REPOWER FOR THIS LOAD AND THE PPLAN" (a repower refers to
another driver taking the load, and the pre-plan refers to the
Havelock trip, or any other trip following the current one) so
that he could go home and see his doctor.  OBC Message Log at 1,
9, 10.  All three messages (at 5:58 p.m. the previous evening
and 6:16 and 7:02 a.m. that Sunday morning) were "claimed" at
8:51 a.m. by the Sunday manager, Nathan Anglin, who may have

electronically acknowledged their receipt.  Anglin Dep. at p. 31.

While Anglin claimed the Sunday messages at 8:51 a.m. (i.e., 9:51 a.m. EST), the receipt of the 5:58 p.m. message is marked in the dead of night, at 02:20 a.m. on Sunday.  OBC Message Log at 1; Anglin Dep. at p. 30.  Anglin does not know whether Schoenfelder had also seen the 5:58 p.m. message (which, as noted, came after his fleetwide sign-off message at 5:52 p.m., not to mention the end of his shift).  Id. at p. 211. Anglin's shift began at 8 a.m. CST, and he worked out of what might be called a field office in Columbus, Ohio, rather than the PPG building in Pittsburgh, which hosted the bulk of JB Hunt's operation (including Schoenfelder).  Id. at pp. 30, 211.

Accordingly, on Sunday morning, when Anglin arrived, he was in receipt of three successive messages from England – at 5:58 p.m. on Saturday and at 6:16 and 7:02 a.m. early on Sunday morning – in which he reported a physical inability to continue driving and requested relief so that he could go home and see his doctor.  That was soon followed by the note in the dispatch log at 8:52 a.m. on Sunday stating that the driver advised that he was "to [sic] sick to run this load."  Dispatch Log.  Anglin, who was apparently leaving open the possibility that he created that note,[6] says that it "probably" referred to the Havelock

---

[6] The uncertainty arises from the circumstance that the note was initialed "NET" whereas other notes in the same log that Anglin wrote carry "NGA" as his initials.  Thus, Anglin testifies, "No.  I'm NGA.  Oh, NET could be me.  But it also could be the computer."  Anglin Dep. at p. 179.

load, and not to the load England was in fact transporting. Anglin Dep. at pp. 228, 231.

Anglin took no other action, however. Significantly, he acknowledges that the OBC messages, standing alone, would indicate that England should not be allowed to drive anywhere. Id. at p. 301. But "the deadhead that I saw and his location and the confusion on the load" changed Anglin's view. Id. As he explains, "When Grant did the T-call Saturday, it teases — it tricks the computer into thinking he's in Niles so he gets paid for those miles. So when I would have seen that on Sunday, it would have looked like he was originating from Niles, not Morgantown, West Virginia." Id. at p. 47. Although the dispatch log shows that the location (presumably automatically) updated from Havelock to Niles at the time of the 4:06 p.m. T-call, not only did the accompanying note clarify that England had yet to travel to Niles, but as early as 2:44 a.m. on Sunday morning, next to a note of the driver's location, the location field correctly displayed "RINWV" for Ringgold; moreover, OBC messages are always marked with correct locations. Dispatch Log; OBC Message Log.

Anglin says he did not want to overrule Schoenfelder, notwithstanding the new messages, "[b]ecause the deadhead, to me at the time, would have said that Grant would have had to have known something and probably set something up with Dwane." Anglin Dep. at pp. 301-02. Indeed, Anglin assumed that England's being sick caused Schoenfelder to enter the deadhead.

<u>Id.</u> at p. 303.  In the meantime, Anglin sent out two fleetwide safety messages.  OBC Message Log at 1.

After several hours went by on Sunday without reply from Anglin, England followed up with additional messages.  At 12:34 p.m. he wrote, "NATHAN ANY WORD ON WHAT IS GOING TO HAPPEN. I CANNOT FINISH THIS LOAD. I AM REALLY REALLY SICK AS SAID IN THE OTHERS [sic] MESSAGES. I JUST HAVE TO GET TO MY DOCTOR," and at 12:35 he wrote that he was still "UNDER THE LOAD GOING INTO CANADA."[7]  OBC Message Log at 11, 12.  Anglin finally replied at 12:43 p.m. that JB Hunt did not have anyone to repower the load and added, somewhat cryptically, "YOU HAVE TO DO WHAT YOU HAVE TO DO."  <u>Id.</u> at 13.  Before he reached the conclusion that a repower was not feasible, Anglin did not discuss the matter with anyone else.  Anglin Dep. at pp. 238-39.  He does not remember "what context" accompanied his message; but he says that the exhortation to "do what you have to do" referred to JB Hunt's "captain of the ship" approach whereby the driver can stop for safety reasons without management second-guessing his decisions.  <u>Id.</u> at p. 243.  In response, England messaged at 1:01 p.m., "OK GOT YA, GOING TO DROP THIS LOAD NILES YARD, AND THEN HEAD HOME," and again at 1:24 p.m., "I AM HEADED TO NILES YARD TO DROP."  OBC Message Log at 2, 14, 15.  "What load?" replied Anglin at 1:43 p.m.  <u>Id.</u> at 16.  As noted, he says he thought in the morning that England was empty already,

---

[7] This need not suggest that England thought <u>he</u> was going to Canada.  Even though the deadhead went through, the plan for him was to drop off at Niles yard the load that someone else would then take up to Woodbridge.

en route to Ripley, after having dropped off the load in Niles.
Anglin Dep. at p. 234.

To clear up matters, Anglin called England at around
1:45 p.m. on the phone.  __Id.__ at 17.  The conversation made clear
that England had not yet dropped off his load at Niles.
Accordingly, after the call, Anglin became "aware that [England]
was headed to Niles" with the load.  Anglin Dep. at pp. 252,
314.  A subsequent JB Hunt collision review, which, according to
plaintiffs, was prepared by Kleemook, contains this description
of the call:

> On Saturday 2/14/2015 Dwane sent an OBC message at
> 1706[8] stating that he was not feeling well and he
> did not want to take dispatch on his next load.
> Dwane was on break at the time and did not move his
> truck until he spoke with the Sunday morning
> manager.  When the Sunday morning manager spoke
> with Dwane, he stated that he was not feeling well
> and wanted to drive home to get the proper rest.
> The manager instructed Dwane to head to the yard,
> drop off his current load, and head home.

MCR at 2; Pffs. Br. at 10.

Anglin disputes the claim that he "instructed" England to do
anything during their conversation.  Anglin Dep. at pp. 252-53
("I didn't tell him to do anything. . . .  We came to the
agreement that . . . he was — that we would drop the load at
Niles, and he would go home.").  In addition, Anglin appears to
say, contrary to the collision review, that England had begun

---

[8] The report may be in EST.  As noted, at that time, 4:06 p.m. CST, Schoenfelder put in the T-call to Niles and then
(maybe) Ripley, which he attributes to a request from England.  No message from England requesting it that would
correspond to this description is in the record, however.

driving to Niles even before Anglin called around 1:45 p.m.  Id. at p. 252.  Anglin rejects the implication that he insisted on England proceeding to Niles in order to deliver the load on time, i.e., for JB Hunt's economic gain (e.g., to avoid the late payment to PPG, among other repercussions).[9]  In his mind, it would not have mattered much whether the load "was sitting in Morgantown, or whether it was sitting in Niles."  Id. at p. 316.

Anglin did not ask England about the nature of his illness.  Id. at p. 257.  In addition, Anglin undertook no efforts to arrange for other transportation to take England home where he could see his family doctor, or to another medical facility.  Id. at pp. 243, 302.  Anglin, however, recalls that during their 1:45 p.m. phone conversation, yet again, England probably expressed a wish to see his doctor in West Virginia. Id. at p. 292.  Pertinently, Anglin knows the federal laws and regulations against impaired driving, namely, that he could not permit someone to drive if that person was too ill to drive. Id. at pp. 257, 295.  Indeed, Anglin recalls the safety department at JB Hunt "preach[ing]" the federal requirements "quite a bit."  Id. at p. 116.  In his words, without a leading prompt, Anglin states the federal rule as follows, "If a driver is unsafe or unfit to drive, he can't drive the truck."  Id.  At the same time, Anglin says that he does not know of a distinct

---

[9] Anglin, who usually works the night shift (except Sunday), says that although he does not get calls from PPG when a load is late, he could get a call from his supervisor, an account manager.  Anglin Dep. at p. 100.  In such circumstances, Anglin says that he has called drivers to find out why they were late.  Id. at p. 101.

JB Hunt policy that applies in such circumstances.  <u>Id.</u> at p. 89.

Anglin testifies that, notwithstanding his receipt of England's messages, he at no point held the belief that England was too sick to drive "at all."  <u>Id.</u> at p. 284.  In their phone conversation, Anglin says that England did not communicate such total inability to drive.  <u>Id.</u> at p. 283.  And, on the phone, Anglin picked up no signals or cues that England might be impaired so that it was unsafe for him to drive.  <u>Id.</u> at pp. 284-85.  In particular, England's speech was coherent and similar to that on past occasions.  <u>Id.</u> at p. 285.  Accordingly, Anglin could discern no reason "to doubt the ability" of England to decide whether he could drive.  <u>Id.</u> at p. 284.  Moreover, Anglin inferred from the deadhead that Schoenfelder had already determined that England was in a position to drive home.  <u>Id.</u> at p. 305.  Consequently, Anglin concluded that England was "safe" to execute the plan of driving to Niles to drop off the load that the two of them agreed upon.  <u>Id.</u> at p. 316.  The colloquy between plaintiffs' counsel and Anglin at Anglin's deposition merits reproducing here, in light of the language of the federal statute and the nature of the case:

> Q. [Plaintiffs' counsel] Okay.  So the decision was made by you – as an employee of J.B. Hunt, in the position you hold – you permitted Mr. England to drive to Niles, Ohio, and you permitted him to drive home; is that correct?
>
> Mr. Markins [defendants' counsel]: Object to form.
>
> A. [Anglin] Yes.

Anglin Dep. at pp. 321-22.

That phone conversation with Anglin turned out to be the last time JB Hunt management heard from England that day. After he dropped off the load in Niles at 4:31 p.m., OBC Message Log at 1, 18, England turned back south and suffered the unfortunate accident when he nearly reached home. En route, he exchanged text messages with his wife, in which he complained of pain and difficulty sitting. JB Hunt Ex. A at 1. He indicated that his medications were running out and the pain was intensifying. Id. When he wrote that he was not "100 percent sure" that he would make it home that night, Mrs. England urged him to do so because of a forecast of four inches of snow the next day. Id. "[I]ts just really hard to sit behind the wheel," reads one of his last messages. Id.

On Monday morning, someone at JB Hunt with initials "AOA" put in two notes in the dispatch log. One of them, a second T-call, stated that the load was still at shipper and PPG cancelled the load, at 7:32 a.m. Dispatch Log. Schoenfelder reasonably explains that this reference is to the Havelock load. Schoenfelder Dep. at p. 93. Then, at 4:55 p.m. on Monday, after being notified of the accident, Anglin added an entry in the dispatch log, "Say what? Drvr is not even driving? Rght?" Dispatch Log.

The court quotes the applicable federal regulation once more, this time setting it forth in its entirety:

No driver shall operate a commercial motor vehicle, and a motor carrier shall not require or permit a driver to operate a commercial motor vehicle, while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him/her to begin or continue to operate the commercial motor vehicle. However, in a case of grave emergency where the hazard to occupants of the commercial motor vehicle or other users of the highway would be increased by compliance with this section, the driver may continue to operate the commercial motor vehicle to the nearest place at which that hazard is removed.

49 C.F.R. § 392.3.

It may be instructive to place England's experience in the broader tableau of the company's handling of driver illness. JB Hunt and its employees involved in these events have had some experience with arranging alternative transportation for sick drivers and, more generally, with similar situations to England's. On one occasion, Schoenfelder "arranged a team of two drivers to pick up a sick driver" to "help him get home." Schoenfelder Dep. at p. 29. "If he's too sick to drive, he shouldn't be driving a truck." Id. at p. 106. Moreover, "it's the driver's responsibility to make the call to say if they're too sick to drive or not." Id. at p. 25. At the same time, Schoenfelder cautions that whether JB Hunt repowers a load in response to a driver's notification that he is "too sick to drive" depends on how "lax" on "delivery times" the shipper or receiver is. Id. at p. 35.

Interestingly, the general manager, Kleemook, is unaware of the relevant federal law or any JB Hunt policy on how

to handle driver complaints of illness.  Kleemook Dep. at pp. 68, 73-74.  Maybe that colors his ostensibly pragmatic approach to the issue.  Thus, to him, the means by which a sick driver returns home "depends on distance"; while driving from California to New York would be infeasible, "if a driver is local, it's a consideration."  Id. at pp. 73-74.  Kleemook elaborates, "[W]ould I allow Dwane to drive one hour or would I allow him to drive two hours?  It would be up to that driver's tolerance to his illness."  Id. at p. 75.  Relevant factors include a driver's "working relationship with management," in addition to "what he is conveying to the dispatcher."  Id. at p. 74.  However, if someone reports that he is "too sick to drive," that driver, local or not, is not allowed to drive home, and JB Hunt would instead call an ambulance or arrange some other means of transportation.  Id. at p. 76.  Nevertheless, Kleemook finds no fault with Anglin's conduct with respect to England.  Id. at p. 77.  When plaintiffs' counsel asks Kleemook whether England's messages tell him "one way or the other whether the driver is too sick to drive," he replies, "To my understanding, I would not know what that means."  Id.

In fact, notwithstanding the testifying employees' apparent lack of knowledge of it, the JB Hunt employee manual does contain a "Policy on Fatigue Management," which sets out the first sentence of 49 C.F.R. § 392.3, Ill or Fatigued Operator, but supplements it with a substituted second sentence that plaintiffs believe blurs the line between the regulation

and the company policy.  Specifically, the manual provides, in
relevant part:

> **Federal law is clear on this matter.**
>
> **FMCSR §392.3 Ill or Fatigued Operator**
>
> No driver shall operate a commercial motor vehicle,
> and a motor carrier shall not require or permit a
> driver to operate a commercial motor vehicle, while
> the driver's ability or alertness is so impaired,
> or so likely to become impaired, through fatigue,
> illness, or any other cause, as to make it unsafe
> for him/her to begin or continue to operate the
> commercial motor vehicle.  Please notify your
> manager so they can reschedule your appointment
> time or route you home for medical care as needed.
> There is no penalty for compliance with Federal
> regulations!

JB Hunt Ex. 7, Excerpt from 2015 Driver Manual; Pffs. Resp. at
5.  The parties differ in their interpretation of this policy.
In plaintiffs' view, it is "unconscionable" in that it "coerces
[JB Hunt's] drivers to continue to drive home even after they
report an illness," Pffs. Resp. at 6.  JB Hunt disputes the
plaintiffs' characterization of the policy as a "'false'
statute" because it "references the federal regulation . . . and
then continues to state what J.B. Hunt's recommendations are[,]
in order to give guidance with respect to compliance of the
same."  JB Hunt Rep. at 3.  Without addressing the merits of the
critique that the policy inappropriately confounds federal
regulation and company rules, JB Hunt argues that "the manual
attempts to paraphrase the statute for the benefit of truck
drivers, some of whom are likely of limited education, a
'Reader's Digest' version of the statutory requirements."  <u>Id.</u>

The officer who responded to the scene of the accident, West Virginia State Police Sergeant Robert E. Richardson, is a principal source of information on the circumstances of the crash. Sergeant Richardson filled out the uniform traffic crash report, which sets the time of the crash at 22:50 EST. West Virginia Uniform Traffic Crash Report at 1. In the narrative section of the report, he wrote that the driver "lost control and traveled off the right/west roadway edge into the ditchline" and then "continued traveling south along the ditchline where it collided into the embankment." Id. at 2. Then the vehicle "overturned" and "skidded a short distance." Id. Sergeant Richardson checked the "None evident" box in the report's "Crash Avoidance Maneuver" column and "Essentially Straight Ahead" in the "Vehicle Maneuver/ Action" column. Id. at 4. The report does have the "Road Surface Condition (Wet, Icy, etc.)" box checked as a contributing circumstance. Id. at 2. As the plaintiffs' visual exhibit shows, the truck decelerated on a stretch of southbound I-77 that curved ever so slightly to the left. Pffs. Ex. 25. With England no longer controlling the vehicle, the tractor-trailer began slowing from its 60 mph speed 500 feet from the crash site, and was advancing at 35 mph when it left the roadway 260 feet away from the crash site. Then 70 feet away it entered the rocky ditch line. Id. In his deposition, Sergeant Richardson characterizes what he saw as "a weird situation" inasmuch as he does not recall "skids or anything like that." Dep. of Robert E. Richardson at p. 16. He testifies that "there didn't appear to be any . . . evasive

action." <u>Id.</u> at p. 30. Explaining that the cause could be
"falling asleep" or being passed out, the sergeant emphasizes
that England "just drove straight into the ditch line
gradually." <u>Id.</u> at p. 31. While there is a rumble strip on the
shoulder of I-77, the officer observed no "striations." <u>Id.</u> at
p. 32.

## II. Summary Judgment Legal Standard

Summary judgment is appropriate only "if the movant
shows that there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a). "Material" facts are those necessary to
establish the elements of a party's cause of action. <u>Anderson</u>
<u>v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 91
L. Ed. 2d 202 (1986); <u>see also</u> <u>News & Observer Publ'g Co. v.</u>
<u>Raleigh-Durham Airport Auth.</u>, 597 F.3d 570, 576 (4th Cir. 2010)
(same).

A genuine issue of material fact exists if, in viewing
the record and all reasonable inferences drawn therefrom in a
light most favorable to the non-moving party, a reasonable fact-
finder could return a verdict for the non-movant. <u>Anderson</u>, 477
U.S. at 248. The moving party has the burden of showing — "that
is, pointing out to the district court — that there is an
absence of evidence to support the nonmoving party's case."
<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). If the
movant satisfies this burden, then the non-movant must set forth
specific facts as would be admissible in evidence that

demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c); id. at 322-23.

Summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 248. Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. Overstreet v. Ky. Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

When examining the record, the court must neither resolve disputes of material fact nor weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility, Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Instead, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Along those lines, inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962).

### III. Governing Law

Deliberate intention represents a narrow exception to the general rule of workers' compensation immunity from tort

liability for workplace injuries and accidents.  In order to recover, a plaintiff has to successfully pursue one of two avenues to establishing such deliberate intention on the employer's part.  The first method sounds in traditional deliberate intention, namely, the immunity is lost if the employer or other person against whom liability is asserted "acted with a consciously, subjectively and deliberately formed intention to produce the specific result of injury or death to an employee."  W. Va. Code § 23-4-2(d)(2)(i) (2005).[10]

This case, however, involves the second avenue, which the court will refer to as constructive deliberate intention, as prescribed by § 23-4-2(d)(2)(ii) (2005).  Inasmuch as the accident occurred on February 15, 2015, the parties seem to agree that the 2005 version of the statute, which applied down to its amendment in 2015, is applicable here.  JB Hunt Br. at 8; Pffs. Resp. at 2.[11]

A showing of constructive deliberate intent in this case requires plaintiffs to establish the following five statutory factors:

> (A) That a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death;
>
> (B) That the employer, prior to the injury, had actual knowledge of the existence of the specific

---

[10] The opinion cites the 2005 version of the statute inasmuch as it is operative in this case.

[11] The amendments specify that they "shall apply to all injuries occurring on or after July 1, 2015."  W. Va. Code § 23–4–2(g) (2015).   See also Kane v. Corning Glass Works, 331 S.E.2d 807, 808 n. 1 (W. Va. 1984) (linking an earlier version of the deliberate intent statute in force to the date of the injury).

unsafe working condition and of the high degree of
risk and the strong probability of serious injury
or death presented by the specific unsafe working
condition;

(C) That the specific unsafe working condition was
a violation of a state or federal safety statute,
rule or regulation, whether cited or not, or of a
commonly accepted and well-known safety standard
within the industry or business of the employer, as
demonstrated by competent evidence of written
standards or guidelines which reflect a consensus
safety standard in the industry or business, which
statute, rule, regulation or standard was
specifically applicable to the particular work and
working condition involved, as contrasted with a
statute, rule, regulation or standard generally
requiring safe workplaces, equipment or working
conditions;

(D) That notwithstanding the existence of the facts
set forth in subparagraphs (A) through (C),
inclusive, of this paragraph, the employer
nevertheless intentionally thereafter exposed an
employee to the specific unsafe working condition;
and

(E) That the employee exposed suffered serious
compensable injury or compensable death as defined
in section one, article four, chapter twenty-three
whether a claim for benefits under this chapter is
filed or not as a direct and proximate result of
the specific unsafe working condition.

W. Va. Code § 23-4-2(d)(2)(ii) (2005).

Consequently, plaintiffs would have to prove all five
elements (A) through (E) to obtain summary judgment, while
defendants can prevail on summary judgment by showing that
plaintiffs lack the evidence to establish at least one of these
elements at trial.

The federal safety regulation allegedly violated by JB
Hunt, which serves to establish element (C), is the regulation
on ill or fatigued operators, 49 C.F.R. § 392.3.


## IV.  Analysis

Plaintiffs contend that England reported his illness
to JB Hunt early on, perhaps on Friday, when Appod redirected
him to Niles, or on Saturday, during his exchange of messages
with Schoenfelder.  Anglin, who came on duty on Sunday, received
continued messages of distress from England.  Anglin's inability
or unwillingness to repower the load in response may have been
at least in part motivated by the economic pressure of
delivering the load to Canada in a timely fashion, lest JB Hunt
be subjected to PPG's late penalty.  Moreover, Anglin did not
wish to disturb what he says was the earlier decision by
Schoenfelder to have England drop off the load at Niles and only
then head home.  Presented with no viable alternative, England
acquiesced, and, quite possibly due to the effects of his health
condition, lost control of his vehicle when he was tantalizingly
near his home base near Ripley, West Virginia, perhaps as a
result of falling unconscious, which caused his accident and
injuries.

In contrast, JB Hunt may dispute that it was on notice
of anything wrong with England's health until his late Saturday
message informing dispatch of his illness.  Communications from
England did not specify his condition though he noted his

persistent wish to be relieved of his load and see his treating physician in West Virginia. He was supposed to drop off the shipment at the Niles yard, and while Schoenfelder entered a T-call for Niles on Saturday, it was for pay purposes. Despite the log entry of "NILOH ERIPWV," Schoenfelder says that it was not to have England cut short his eleven-day driving stretch and send him home instead. Somehow, though, the deadhead to Ripley (that Schoenfelder believes he did not enter) is said to have loomed large in Anglin's mind. Anglin says he was deferring to Schoenfelder. And Anglin says the T-call reset of the location field confused him into thinking that England had already dropped his load at Niles, and was heading home. And if he was heading home anyway, maybe it was not so consequential that he was not feeling well; he'd be in Ripley soon enough, the logic went. Finally, Anglin called England, and it was decided to have England drive to Niles and then back south to West Virginia. Inasmuch as JB Hunt held England, an experienced and safe driver, in high regard, his assessments of whether he was in a position to execute that plan were not questioned.

After the phone call, England did not communicate with JB Hunt. Of course, if, as his messages to his wife may suggest, at any point he felt that his condition changed and he needed to stop, he should have stopped, defendant argues. JB Hunt contends that his years of experience with the company would have left him with no doubt that he would have suffered no adverse consequences from stopping for safety reasons. Finally, insofar as England's earlier messages emphatically called for JB

Hunt to dispatch another driver to relieve him, JB Hunt asserts he was referring only to the long trip to Canada, and then to Texas, that he had originally been slated for.  Plainly, nobody at JB Hunt knew that fateful Sunday that anything should preclude England from safely driving to Niles, goes the story.

### A. Specific Unsafe Working Condition

The court is satisfied that operating a trailer-tractor when one's health is impaired constitutes a "specific unsafe working condition" in the meaning of W. Va. Code § 23-4-2(2)(ii)(B).  There is a genuine issue of material fact as to whether the condition "presented a high degree of risk and a strong probability of serious injury or death" under the circumstances of this case.

### B. Actual Knowledge

The second element of the statutory test requires not only that the employer have actual knowledge of the condition but also that it realize the high degree of risk and strong probability of serious injury or death, associated with that condition.  Harbolt v. Steel of West Virginia, Inc., 640 F. Supp. 2d 803, 810 (S.D.W. Va. 2009).  Additionally, the actual knowledge requirement is not satisfied by evidence that the employer reasonably should have known of the condition and of the strong probability of serious injury or death.  Harbolt, 640 F. Supp. 2d at 809-10 (quoting Mumaw v. U.S. Silica Co., 511

S.E.2d 117, 123 (W. Va. 1998)).  In this case, the question is
most appropriately framed as one of whether Anglin, and in turn
JB Hunt, was on notice that England had a condition which
rendered it unsafe for him to drive to Niles and then back to
Ripley.

Cases of this kind seldom involve direct evidence of
subjective knowledge.  Therefore, proving actual knowledge
"requires an interpretation of the employer's state of mind, and
must ordinarily be shown by circumstantial evidence, from which
conflicting inferences may often reasonably be drawn."  Syl. Pt.
2, in part, Nutter v. Owens-Illinois, Inc., 550 S.E.2d 398, 399
(W. Va. 2001).

The crux of this case centers on JB Hunt's Sunday
manager, Nathan Anglin, who was the one on duty for JB Hunt when
a series of three messages from a plainly ill England were
claimed and seen by Anglin at 8:51 a.m. on Sunday.  That
included the 5:58 p.m. Saturday message that notified JB Hunt
that he was "pretty sick" and so planned to rest at the stop at
Ringgold on Sunday and resume driving on Monday.  Next came the
message from England at 6:16 a.m. on Sunday stating that he was
"so sick i will not be able to go anywhere today," followed by
another at 7:02 a.m. requesting that another driver take the
load so that he could go home and see his doctor.

It is quite likely that it was Anglin who, at 8:52
a.m. on Sunday, entered a note that England had advised that he
was too sick to run "THIS LOAD."  Anglin failed to respond to

England's messages of illness including a request that the load be repowered in the hands of another driver so that England could go home and see his doctor.  Hours went by until England, at 12:34 p.m. again sent a pleading request that is worthy of repetition:

> NATHAN ANY WORD ON WHAT IS GOING TO HAPPEN.  I CANNOT FINISH THIS LOAD.  I AM REALLY SICK AS SAID IN THE OTHERS [sic] MESSAGES.  I JUST HAVE TO GET TO MY DOCTOR.

England added at 12:35 p.m. that he was still "UNDER THE LOAD GOING INTO CANADA."

Anglin finally replied at 12:43 p.m. that he had no one to repower the load, though he had consulted no one else, and added "YOU HAVE TO DO WHAT YOU HAVE TO DO."  England appears to have reasonably interpreted that admonition to mean that he was expected to leave Ringgold near Morgantown and drive to Niles, drop the load and drive back to his home.  England so stated in a 1:01 p.m. message and added at 1:24 p.m. that he was headed to Niles to drop.  At 1:43 p.m. Anglin curiously asks, "WHAT LOAD?," despite England's earlier messages at 7:02 a.m. asking that his load be repowered and at 12:34 p.m. stating that he could not finish the load.

Anglin then called England around 1:45 p.m.  Anglin now says he and England reached an agreement that England would drop the load at Niles and then go home.  But England, of course, has no memory of any of these events.  Telling, however,

is what Jamie Kleemook, JB Hunt's general manager for the PPG account, found as set forth in JB Hunt's collision review:

> When the Sunday morning manager spoke with Dwane, he stated that he was not feeling well and wanted to drive home to get the proper rest. The manager instructed Dwane to head to the yard, drop off his current load, and head home.

Though Anglin now says he instructed nothing, that is not what Kleemook learned from his investigation, namely, that notwithstanding England's illness and his desire that he be permitted to go home to his doctor, JB Hunt's Sunday manager instructed him to drive from near Morgantown to Niles and drop his load before making the drive back home. England complied, despite his illness, and embarked on a nine-hour road trip that would end in tragedy.

On the other hand, a factfinder may believe that after their phone conversation, Anglin was satisfied that England could proceed to Niles and was not aware of any unsafe working condition. JB Hunt contends that England himself created the condition by continuing to drive on Sunday afternoon, when he felt that it became unsafe and he should have stopped. Defs. Br. at 11. In support of this argument, JB Hunt notes that it is both a "fundamental 'rule of the road'" in the industry and a JB Hunt policy, referred to as "Captain of the Ship," that the driver is ultimately responsible for his truck and load. Id. The employee manual states, "If you experience fatigue or illness it may become necessary to make the decision to find a safe legal location to get off the road." JB Hunt Ex. 7 at 3.

The federal regulation requires the driver to not drive while ill or fatigued just as much as it forbids his employer to order him to drive under such circumstances. 49 C.F.R. § 392.3. If, however, England was instructed by the Sunday manager, who must have known him to be ill, to embark upon the fateful Sunday trip, the "Captain of the Ship" argument tends to fade away.

Inasmuch as there is a genuine question of material fact on this element, neither party prevails on its summary judgment motion.

## C. Violation of Government Safety Regulation

The third requisite element is satisfied by the above quoted Federal Motor Carrier Safety Regulation on "Ill or fatigued operator," 49 C.F.R. § 392.3, though JB Hunt counters with its Captain of the Ship theory.

## D. Intentional Exposure

The fourth element requires intentional exposure to the condition on the employer's part. This element is not satisfied if the exposure is "inadvertent or merely negligent." Mumaw v. U.S. Silica Co., 511 S.E.2d 117, 125 (W. Va. 1998).

Under this element, the primary question is whether JB Hunt's Anglin knowingly exposed England to the unsafe condition. Plaintiffs' evidence is straightforward: Anglin sent England a message that his load could not be repowered, and in their

conversation, instructed him to drive from the Morgantown truck stop to Niles before heading home.

On the other hand, JB argues that England was "captain of the ship" and exposed himself to danger. Drivers are allowed to stop and park, consistent with the policy. Anglin Dep. at p. 317 (confirming that a driver can ground himself and saying that "Captain of the ship overrides all of our actions"); England Dep. at p. 167. The driver's safety decisions are not questioned, whether or not they have merit. Kleemook Dep. at pp. 88-89; England Dep. at p. 163.

In this regard, plaintiffs argue that England was not in a position to abandon the truck and seek medical attention; according to the employee manual, doing so would bring about his automatic termination. Pffs. Resp. at 6; Pffs. Ex. 17, Driver Manual, at 4. JB Hunt objects that the provision would not apply if there were a valid reason for such conduct. JB Hunt Rep. at 4. On this issue alone, there is already a genuine question of material fact. In addition, the factfinder could reasonably reach different conclusions regarding the significance of the telephone conversation of Anglin and England.

### E. Causation

The parties do not dispute that the nature and extent of the injuries satisfy the legal requirement. However, the record does not contain a cause of the accident. For one,

England cannot remember it.  The responding police officer cannot tell whether the illness played any part in the accident and notes that any opinion on causation would be speculative. Richardson Dep. at pp. 29-30.  The police report is similarly silent on the question.  West Virginia Uniform Traffic Crash Report.

Defendants contend that the plaintiffs' attempt to tie the event to the illness is impermissibly speculative and conjectural.  Defs. Br. at 16.  That argument is dubious at best.  Given England's long record of safe service, including at JB Hunt, as well as his multiple reports on this occasion of health problems and repeated requests to be relieved of his driving duty due to illness, a reasonable jury could find causation to be established.  Sergeant Richardson's testimony and the speed records for the truck in the crash report can be used to rule out distracted driving, because of the lack of steering and practically linear deceleration.  Moreover, Kleemook's own collision review, prepared soon after the accident, states in the root cause section, "The driver was feeling ill and stated that he wanted to return home until he felt better. . ."  MCR at 6.  In addition, England's text messages to his wife, complaining of medical symptoms and difficulty sitting and driving, can support the plaintiffs' causation case.  Accordingly, summary judgment would not be appropriate.

## V.    Conclusion

As the foregoing discussion shows, neither party is able to establish a lack of a genuine dispute of material fact on any of the statutory elements of the cause of action.

Accordingly, it is ORDERED that both motions for summary judgment be, and they hereby are, denied.

The Clerk is directed to forward copies of this memorandum opinion and order to all counsel of record.

ENTER: May 30, 2018

John T. Copenhaver, Jr.
United States District Judge